JOHN PAUL BRITTON & another[1] vs. ZONING BOARD OF
APPEALS OF GLOUCESTER; DOUGLAS J. ROSS, intervener.[2]

No. 01-P-1145.

Essex. February 12, 2003. - August 26, 2003.

Present: CYPHER, MASON, & MCHUGH, JJ.

*Zoning,* Special permit, Nonconforming use or structure, Appeal, Board of ap-
peals: decision, By-law, Judicial review.

A Superior Court judge erred in annulling the decision of a zoning board of
appeals to deny the plaintiffs' application under G. L. c. 40A, § 6, for a
special permit to build an addition to their nonconforming single-family
house on their nonconforming lot and in granting the application, where,
although the judge concluded that the adverse aesthetic impact the
plaintiffs' addition would produce was insufficient to warrant denial of the
application, the judge did not conclude, and her own factual findings
would not support a conclusion, that no reasonable board could have
reached a different conclusion. [71-77]

CIVIL ACTION commenced in the Superior Court Department on
December 30, 1999.

The case was heard by *Nancy S. Merrick,* J.

*Linda T. Lowe* for the defendant.

*Stephen E. Meltzer* for the intervener.

*J. Michael Faherty* for the plaintiffs.

MCHUGH, J. Concern about precedent and aesthetics led the
Gloucester zoning board of appeals (board) to deny the
plaintiffs' application under G. L. c. 40A, § 6, for a special
permit to build an addition to their nonconforming single-family
house on their nonconforming lot. The plaintiffs appealed to
Superior Court where, after trial, judgment entered annulling
the board's decision and granting their application. The board,
joined by an intervener, appeals. We reverse.

---

[1] Diane Britton.

[2] There were several interveners at trial; only Ross has joined the present
appeal.

Many facts found by the judge after trial were congruent with those recited in the board's opinion. The plaintiffs own a single-family home on the water in the "Rocky Neck" section of Gloucester. Rocky Neck, as the judge's findings described it,

> "is a small peninsula which juts out into Gloucester Inner Harbor. Rocky Neck provides breathtaking views of the sea, the outer harbor, the inner harbor and the City of Gloucester. Painters from John Singer Sargent to Winslow Homer have worked in this area. Rocky Neck is home to a vibrant artists colony, described by some as the nation's oldest continuously operating art colony. . . . But this artists colony is not all which exists on Rocky Neck. There is a significant residential area as well. This includes the neighborhood in which the [plaintiffs] and the interven-[e]rs live. The neighborhood in question here is no artists colony and is not a grouping of similarly designed and built waterfront homes. To the contrary, as this Court's view confirmed, this neighborhood has a number of different types of homes: some single story, some multistory. There is no one type of architecture, with the houses ranging from typical 'New England' style waterfront cottages to modern 'California' style homes."

The plaintiffs' lot is approximately 4,000 square feet, about one-half of the minimum lot size the current Gloucester zoning by-law requires. All but about 1,000 square feet of the lot is below the line of mean high water and much is below mean low water. In its current configuration, the house sits six feet from the right side lot line and three feet from the left, giving substantially less clearance than the ten feet the by-law requires. Although the front yard setback requirement is twenty feet, the front of the house is inches from the front lot line. Approximately one-half of the plaintiffs' house is built on pilings that extend seaward of mean high water.

The plaintiffs' application sought permission to erect an eight-foot high second-story addition on the landward half of the house. The addition would accommodate a new master bedroom, a full bath, a small alcove and a new stairway in an exterior shaft. The shaft would extend beyond the current footprint of the house into the right-yard setback but not farther than another portion of the house already extends.

The board and the judge differed on the impact on the neighborhood the plaintiffs' proposed addition was likely to have. In the board's view, given the neighborhood's character,[3] the detrimental impact of the plaintiffs' proposed addition would be substantial. As the board explained,

> "on paper and even by model the proposal looks like an apparently modest addition. The fact is, however, that it would add almost a third in volume to the house, double the size of the portion of the house on the uplands, and increase the height at the road by at least eight feet. This is a substantial addition to a house of this size, location and lot area usage. And the height addition is at the road side, which can create, if the road were to widen as it could in the future,[4] a serious blockage and tunneling effect which the Board has been concerned about in other parts of Rocky Neck. And such a height and width addition extended out toward the water would have a significant adverse impact on light, views, breezes and other facets of the waterfront genre in the neighborhood."

The board also found that granting the permit would have an adverse precedential effect because it would "rais[e] the specter of the residential shoreline becoming a series of two and three story houses on tiny lot after tiny lot both in this locality and further" down the street on which the plaintiffs live.

The judge, however, found that the expansion would "not

---

[3]The neighborhood, in the eyes of the board, contained

> "[b]uildings . . . on tiny lots within arms' length of one another. Traditional lines and locations have always provided a balance for all residents, with waterfront buildings respecting waterview buildings, [sight] lines preserved by tradition, a fair and reasonable opportunity existing for the entire neighborhood to co-exist in a cherished, old waterfront community, to enjoy the proximity to the ocean with its light, breezes and views, and to experience collectively the bustle of the harbor. . . . It is quite common to have single story or low outline houses on tiny lots on the water . . . . The addition of multiple stories to such single story, non-conforming waterfront houses on such tiny lots disrupts greatly the neighborhood balance."

[4]The board found that the road at the front of the plaintiffs' property "has not in fact been paved to its fullest extent," and that any future widening "is in the province of a property owner . . . who controls this private road."

create any additional noises [or] odors and will not interfere with the air, light and breezes currently enjoyed by neighbors." She did find that the addition would affect views but, because the plaintiffs' house was lower than upland houses, there would be "minimal, and in some cases, no intrusion [on] people's views of the Harbor. . . . The partial second story will only minimally change [the appearance of the plaintiffs' house to upland neighbors] but will certainly not block anyone's view entirely, cast shadows on other lots, or otherwise operate to the detriment of the neighboring homes." The judge summed up by finding "that the proposed addition is a modest, tasteful expansion which is completely consistent with the tone and character of the neighborhood. There is nothing about it which will have a detrimental impact on the neighborhood. The addition will have a nonexistent impact on most of the neighbors' waterviews or minimal at best."

The judge's factual findings led her to "part company" with the board on the question whether the proposed addition would be "substantially more detrimental than the existing nonconforming structure . . . to the neighborhood." Traveling her separate path, the judge concluded that the plaintiffs' "minor addition" would not adversely affect the neighborhood "except in the most minimal sense." Although stating that the precedential effect of granting the permit was, as a general proposition, a matter for legitimate concern, the judge concluded that "the modest nature of [the plaintiffs'] proposed addition" obviated that concern in this case. On the basis of her findings and conclusions, she ordered, as noted, that judgment enter annulling the board's decision and granting the plaintiffs' permit application.

We begin our discussion by observing that expansion of nonconforming uses and structures is governed by G. L. c. 40A, § 6. When applications for expansion of residential structures are at issue, the statute requires a two-step analysis. Step one focuses on whether the proposed addition or expansion will increase the structure's nonconforming nature. If the answer is no, the applicant is entitled to build. If the answer is yes, the applicant may build only if he or she obtains a special permit issued by the permit granting authority upon a finding that the

proposed addition will not be substantially more detrimental to the neighborhood than the existing nonconforming structure. *Fitzsimonds* v. *Board of Appeals of Chatham*, 21 Mass. App. Ct. 53, 55-56 (1985). *Goldhirsh* v. *McNear*, 32 Mass. App. Ct. 455, 460 (1992).

In this case, both the judge and the board agreed that the plaintiffs' proposal would increase the nonconforming nature of the house both because of its increased height and because the new stairway shaft would extend beyond the existing footprint into the right setback area. See *Fitzsimonds* v. *Board of Appeals of Chatham, supra* at 57; *Goldhirsh* v. *McNear, supra* at 461. Accordingly, both the board and the court proceeded to the second step and considered whether the addition would be substantially more detrimental to the neighborhood than the existing nonconforming structure.

In considering the question of substantial detriment, the board, of course, engaged in the fact finding it deemed appropriate and based its affirmative answer to the question of detriment on the facts as it perceived them. Thereafter, on appeal, the court was required to engage in a process that was in part deferential to the board and in part not. We recently described that process in some detail in *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. 349, 355-356 (2001), and shall not repeat the discussion in all of its fullness here. In summary, though, the board's decision is the point of departure for the court's review. See *S. Volpe & Co.* v. *Board of Appeals of Wareham*, 4 Mass. App. Ct. 357, 359 (1976). In exercising its power of review, the court must find the facts de novo and give no weight to those the board has found. See G. L. c. 40A, § 17; *Pendergast* v. *Board of Appeals of Barnstable*, 331 Mass. 555, 558-559 (1954); *Anderson* v. *Planning Bd. of Norton*, 56 Mass. App. Ct. 904, 905 (2002). See generally *Swan* v. *Justices of the Superior Ct.*, 222 Mass. 542, 548 (1916). In the end, the court must affirm the board's decision unless it finds that denial of the application was "based on a legally untenable ground, or [was] unreasonable, whimsical, capricious or arbitrary." *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 639 (1970). See G. L. c. 40A, § 17. See also *Parrish* v. *Board of Appeal of Sharon*, 351 Mass. 561,

568 (1967); *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. at 355.[5]

Those principles are familiar. Nevertheless, their application is sometimes difficult because to describe the scope of judicial review does not, by itself, always provide guidance regarding the kind and degree of discretion the board possesses in a given case and the consequent deference the court must give to the board's denial decision. The difficulty can be reduced by recognizing that judicial review typically requires two principal inquiries, one of which involves an almost purely legal analysis and the other of which involves a highly deferential bow to local control over community planning.

As for the first inquiry, an essentially legal analysis is required to decide whether the board's decision was based on "a legally untenable ground," or, stated in a less conclusory form, on a standard, criterion, or consideration not permitted by the applicable statutes or by-laws. See, e.g., *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. at 639-640; *Gumley* v. *Selectmen of Nantucket*, 371 Mass. 718, 723 (1977). Here, the approach is deferential only to the extent that the court gives "some measure of deference" to the local board's interpretation of its own zoning by-law. *APT Asset Mgmt., Inc.* v. *Board of Appeals of Melrose*, 50 Mass. App. Ct. 133, 138 (2000). In the main, though, the court determines the content and meaning of statutes and by-laws and then decides whether the board has chosen from those sources the proper criteria and standards to use in deciding to grant or to deny the variance or special permit application. See, e.g., *Pendergast* v. *Board of Appeals of Barnstable*, 331 Mass. at 558-559; *Tambone* v. *Board of Appeal of Stoneham*,

---

[5]When a permit-granting authority grants an application, "not only must [the authority] make an affirmative finding as to the existence of each condition of the statute or by-law required for the granting of the variance or special permit . . . but the judge in order to affirm the board's decision on appeal must find independently that each of those conditions is met" (citation omitted). *Vazza Properties, Inc.* v. *City Council of Woburn*, 1 Mass. App. Ct. 308, 311 (1973). See *Blackman* v. *Board of Appeals of Barnstable*, 334 Mass. 446, 449-450 (1956); *Coolidge* v. *Zoning Bd. of Appeals of Framingham*, 343 · Mass. 742, 744-745 (1962); *Planning Bd. of Springfield* v. *Board of Appeals of Springfield*, 355 Mass. 460, 462 (1969); *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. 290, 292, 295 (1972). Compare *Cummings* v. *City Council of Gloucester*, 28 Mass. App. Ct. 345, 351 (1990).

348 Mass. 359, 362-365 (1965); *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. at 640-641; *Parseghian* v. *Board of Zoning Appeal of Cambridge*, 7 Mass. App. Ct. 879 (1979); *Fitzsimonds* v. *Board of Appeals of Chatham*, 21 Mass. App. Ct. at 56-57; *Blasco* v. *Board of Appeals of Winchendon*, 31 Mass. App. Ct. 32, 35-39 (1991).[6]

The second inquiry is different. Assuming that the board has drawn on proper criteria and standards, the court then must determine, on the basis of the facts it has found for itself, whether the board has denied the application by applying those criteria and standards in an "unreasonable, whimsical, capricious or arbitrary" manner. More specifically, when reviewing a denial of an application for a permit governed by G. L. c. 40A, § 6, the question for the court is whether, on the facts the judge has found, any rational board could conclude that the addition or alteration the applicants propose would be substantially more detrimental to the neighborhood than the existing structure. See *Vazza Properties, Inc.* v. *City Council of Woburn*, 1 Mass. App. Ct. 308, 312 (1973). See also *Parrish* v. *Board of Appeal of Sharon*, 351 Mass. at 567-568.

As is evident, this second element of review, unlike the first, is highly deferential, see *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. at 356 n.11, and gives the board discretion to deny a permit application even if the facts found by the court would support its issuance. See *Pendergast* v. *Board of Appeals of Barnstable*, 331 Mass. at 557-560; *Gulf Oil Corp.* v. *Board of Appeals of Framingham*, 355 Mass. 275, 277-278 (1969); *Subaru of New England, Inc.* v. *Board of Appeals of Canton*, 8 Mass. App. Ct. 483, 488 (1979); *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. at 355.[7] As a consequence, the board's discretionary power of denial extends up to those rarely

The standards and criteria the board actually used in conducting its analysis typically apparent on the face of its decision. Consequently, as the cited cases reveal, little, if any, judicial fact finding ordinarily is required to determine whether the board has based its decision on "a legally untenable ground." Instead, where the court determines that the board has erred in this fashion, the court typically remands the matter to the board after identifying proper standards and criteria so that properly informed administrative fact finding can proceed.

[7]The judge in this case appeared to treat the question of "substantial [greater] detriment[]" as a fact she was required to find de novo. Attempting

encountered points where no rational view of the facts the court has found supports the board's conclusion that the applicant failed to meet one or more of the relevant criteria found in the governing statute or by-law. See *S. Volpe & Co.* v. *Board of Appeals of Wareham,* 4 Mass. App. Ct. at 360; *Davis* v. *Zoning Bd. of Chatham,* 52 Mass. App. Ct. at 356. See generally *D'Ambra* v. *Zoning Bd. of Appeal of Attleboro,* 324 Mass. 61, 62-63 (1949); *Ferrante* v. *Board of Appeals of Northampton,* 345 Mass. 158, 162 (1962); *Hunters Brook Realty Corp.* v. *Zoning Bd. of Appeals of Bourne,* 14 Mass. App. Ct. 76, 79 n.6 (1982).

As noted earlier, the board's denial of the plaintiffs' application rested on two principal grounds, one concerned with aesthetics and the other with precedent. Applying the principles just expressed, the former was entitled to deference but the latter was not.

The board's concern regarding the precedential effect of granting the plaintiffs' permit application was that, in the long term, it would result in the expansion to two and three stories of shoreline residences on tiny lots throughout the neighborhood. However, neither G. L. c. 40A, § 6, nor the by-law permits denial of a special permit based on an undifferentiated fear of the future. Although a board may properly consider the reasonably likely impact of a particular use on an area's development potential, see *Gulf Oil Corp.* v. *Board of Appeals of Framingham,* 355 Mass. at 278, a board may not deny a permit simply by conjuring a parade of horribles, particularly when it has the power to prevent them. As we stated in *Fitzsimonds,* "We think the board erred when it took into account, as bearing upon present decision, a putative problem to be faced in the indefinite future upon now uncertain facts." *Fitzsimonds* v. *Board of Appeals of Chatham,* 21 Mass. App. Ct. at 57.

to determine whether, in this context, "detriment" is a fact, opinion, or conclusion of law, see, e.g., *Florio* v. *Kennedy,* 18 Mass. App. Ct. 917, 918-919 & n.4 (1984); *HRPT Advisors, Inc.* v. *MacDonald, Levine, Jenkins & Co., P.C.,* 43 Mass. App. Ct. 613, 622-623 (1997), invites the kind of analysis by label that typically leads to no useful destination if, indeed, it leads to any destination at all. A finding or conclusion of "substantial detriment," however that term is characterized, triggers the board's power to deny a permit. Therefore, to treat the issue as one subject to de novo judicial fact finding would effectively strip the board of its discretionary power of denial.

The board's concern for aesthetics, however, is on firmer footing, for the board may properly base a decision on aesthetic considerations. See *John Donnelly & Sons, Inc.* v. *Outdoor Advertising Bd.*, 369 Mass. 206, 217-218 (1975); *Dufault* v. *Millennium Power Partners, L.P.*, 49 Mass. App. Ct. 137, 139 (2000). In assessing the addition's aesthetic impact, the judge found that it would "not create any additional noises [or] odors and will not interfere with the air, light and breezes currently enjoyed by neighbors." She found that the addition's only impact would be a "minimal" decrease in some neighbors' water views. That "minimal" decrease would "not block anyone's view entirely" and would "have a nonexistent impact on most of the neighbors' waterviews or minimal at best."[8]

Reduced to essentials, then, the judge agreed that the addition would produce one of the deleterious effects that concerned the board. She disagreed, though, over the extent of that effect. In other contexts, we have held that it is "the board's evaluation of the seriousness of the problem, not the judge's, which is controlling." *Copley* v. *Board of Appeals of Canton*, 1 Mass. App. Ct. 821 (1973). *Subaru of New England, Inc.* v. *Board of Appeals of Canton*, 8 Mass. App. Ct. at 487-488. We have also held that "[s]o long as 'any reason on which the board can fairly be said to have relied has a basis in the trial judge's findings and is within the standards of the zoning by-law and The Zoning Enabling Act, the board's action must be sustained regardless of other reasons which the board may have advanced.' " *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. at 356, quoting from *S. Volpe & Co.* v. *Board of Appeals of Wareham*, 4 Mass. App. Ct. at 360.

There is no reason to depart from those principles here. The deference owed the board regarding the seriousness or the adverse aesthetic impact the plaintiffs' addition would produce should not have been overridden. In other words, although the judge concluded that the adverse aesthetic impact was insuf-

---

[8]In addition to focusing on their "minimal" impact, the judge also appeared to dismiss concerns about water views because none of the viewers had "view easements." Focusing on easements, however, misses the mark. At issue in this case is whether the addition would have an adverse impact on the neighborhood, not whether the plaintiffs' property was burdened by easements favoring one or more neighbors or the neighborhood as a whole.

ficient to warrant denial of the plaintiffs' application, she did not conclude, and her own factual findings will not support a conclusion, that no reasonable board could have reached a different conclusion. Accordingly, the board's decision should not have been undone. The harshness, if any, of the result we reach is not inconsistent with general policy regarding nonconforming uses. See generally *Blasco* v. *Board of Appeals of Winchendon*, 31 Mass. App. Ct. at 39. In any event, that result is dictated by the application of now well-established principles regarding deference to local control of zoning matters.

The judgment is reversed and a new judgment is to be entered stating that the decision of the board did not exceed its authority.

*So ordered.*